IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWEST DIVISION

| | |
|---|---|
| DOMINIC WRIGHT, EAMONN CLEARY, CLEAR MOUNTAIN, LTD., MARTIN LEESE, ANDREW CHITTENDEN, WHITE ROSE PROPERTIES, LLC, STEPHEN ROYALL, STEPHEN ROYALL AND MARIA THOMSON S.M.S.F, LLC, PETER MCRAE, MCRAE FAMILY HOLDINGS, INC., and on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>PEARCE AND DURICK,<br><br>　　　　　　　　　　Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **1:15-CV-098**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

As and for their Class Action Complaint, plaintiffs Dominic Wright, Eamonn Cleary,

Clear Mountain, Ltd., Martin Leese, Andrew Chittenden, White Rose Properties, LLC, Stephen

Royall, Stephen Royall and Maria Thomson S.M.S.F, LLC, Peter McRae, and McRae Family

Holdings, Inc. ("Plaintiffs") allege[1] as follows:

## I. SUMMARY

1.　　From approximately May 1, 2012 until March 31, 2015 ("Class Period"),

Defendant Pearce & Durick actively assisted in offering unregistered securities to the public,

assisting the principals of North Dakota Developments, LLC ("NDD") and related companies in

---

[1] Plaintiffs' allegations pertaining to Plaintiffs and their counsel are made on knowledge. All other allegations are made upon information and belief except as otherwise noted.

1

selling interests in certain modular housing units, coupled with management agreements, to investors both in the United States and abroad.

2.      The investments sold were in the form of Land Lease and Management Agreements and membership units in four commercial housing developments for workers in the Bakken oil field region of western North Dakota and eastern Montana- so-called "man camps" intended to house workers.  The four developments include Great American Lodge - Watford City West, Great American Lodge - Culbertson, Montana, Transhudson - Parshall, and Great American Lodge - Watford City East.

3.      NDD also appears to have marketed additional purported projects known as Transhudson Apartments Williston Heights, and Bakken Base Camp (Alexander, Nebraska), but it is unclear at present whether NDD actually sold any interests in these additional purported developments.

4.      The investment contracts and membership units offered for sale and sold to the investors by NDD and its principals, with the active assistance and participation of Pearce & Durick, are securities as defined in North Dakota Century Code ("N.D.C.C.")  § 10-04-02(19). The sale of interests in the various "man camps" by NDD and its principals represented an integrated offering of securities (as further discussed below).  This integrated offering of securities is sometimes referred to below as the "NDD Offering."

5.      NDD, with the active assistance and participation of Pearce & Durick, made the NDD Offering through general advertising, including an Internet website, print and online advertisements, e-mail solicitations, seminars, direct in-person solicitations, conference calls,

videos, and flyers.  NDD also utilized sales agents who were provided marketing materials and who were paid commissions of at least 10% of the amount invested and as much as 20%.

6.      None of the securities sold by NDD were registered with the Securities and Exchange Commission or any state securities regulator, including the North Dakota Securities Department.

7.      These investment contracts and membership units offered for sale and sold to the investors by NDD are securities as defined in N.D.C.C. § 10- 04-02(19) as well as under federal law. *See* Exh. 1, Cease and Desist Order served on NDD by State of North Dakota Securities Department, *see also SEC v. W.J.  Howey Co.,* 328 U.S. 293 (1946), Section 2(a)(1) of Securities Act (15 U.S.C. 77b(a)(1) and Section 3(a)(10) of the Securities Exchange Act (15 U.S.C. 77b(a)(1)) (defining "security" as including "any… participation in any profit-sharing agreement [or]… investment contract).

8.      None of the sales were made by or through a broker-dealer or agent were registered in accordance with N.D.C.C. § 10-04-10.  Therefore, some of the sales made by NDD were in violation of N.D.C.C. § 10-04-04 and N.D.C.C. § 10-04-10.

9.      The offering materials also contained misrepresentations and failed to disclose material facts, necessary to make the statements made in the offering documents, in light of the circumstances under which they were made, not misleading, in violation of N.D.C.C. § 10-04-04 and N.D.C.C. § 10-04-10.

10.     Pearce & Durick actively assisted NDD and its principals in the NDD Offerings by providing a U.S.-based locus for collection of the proceeds of the NDD Offering, by allowing its escrow accounts to be used for the purpose of receiving wire transfers of investor funds, by collecting the proceeds of purchases of the securities from investors, by collecting the transactional documentation from each investor and compiling them for NDD and its principals, and by providing "Opinions of Counsel" attesting to the completion of sales transactions to some investors.  Each of these professional services or activities were performed by Pearce & Durick in their capacity as attorneys, which applied their specialized education, knowledge, skill, labor, experience and/or training.  Furthermore, at least some of these professional services or activities were performed by Pearce & Durick in their capacity as an attorney researching or certifying title to real estate.

11.     Pearce & Durick also actively interfaced with NDD investors and endeavored to answer questions that investors posed about NDD, the transactions they were conducting with NDD, the status of their NDD investments, and the use of their investment proceeds, lending a false veneer of credibility to the NDD enterprise.

12.     Further, although Pearce & Durick was under a contractual obligation to NDD investors to disburse funds from escrow to NDD only after certain milestones in each NDD development had been reached, in fact Pearce & Durick repeatedly disbursed funds early to NDD, without verifying that investors' modular units had actually been manufactured or installed.

4

13.     Although it disbursed funds as though milestones in the completing of modular units sold in the NDD Offering had been met, in fact Pearce & Durick was on notice of the fact that NDD's manufacturers had not made timely delivery of conforming modular units  In fact, beginning in 2014 Pearce & Durick actually represented NDD and various of its related entities in a lawsuit *against one of NDD's modular unit manufacturers*, a company known as Cascata, alleging that Cascata failed to timely deliver and install modular units. *See* Complaint, *North Dakota Developments, LLC v. Cascata Homes, LLC,* North Dakota District Court, Northwest Judicial District Dkt. No. 27-2014-CV-00309.

14.     As NDD's unlawful sale of unregistered securities and other unlawful conduct became known to the public in recent months, the Securities Exchange Commission brought suit against NDD and its principals, Robert L. Gavin ("Gavin") and Daniel J. Hogan ("Hogan"), as well as various relief defendants, alleging violation of the federal securities laws (including, without limitation, due to sales of unregistered securities). *See SEC v. North Dakota Developments, LLC,* et al., U.S. District Court, District of North Dakota Dkt. No. 4:15-cv-00053.

15.     At the SEC's request, a receiver, Gary Hansen (the "Receiver") has been appointed.  According to the Receiver's June 26, 2015 initial report, despite diligent efforts the receiver has located only about $175,000 in cash and liquid assets owned by NDD- although NDD is believed to have raised over $62 million in proceeds from the NDD Offering.

16.     Plaintiffs now bring this putative class action seeking recovery from Defendant of, *inter alia,* statutory damages arising from Pearce & Durick's actions as an agent of NDD and active assistance of NDD in connection with the NDD Offering. *See* N.D.C.C. § 10-04-17

5

(providing that every "…agent of or for [a] seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser.")

## II.  JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).  The amount in controversy exceeds $5 million and Plaintiffs and members of the putative class are citizens of states and/or foreign states different than Defendants.

18.     Venue is proper under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated in this District.

## III.  PARTIES

19.     Plaintiffs are persons who invested their personal and retirement money with NDD during the Class Period and were damaged thereby in connection with their purchases of unregistered securities from NDD.  Plaintiffs' names and citizenship are as follows:

(a)     Dominic Wright is a citizen of the United Kingdom, and formerly residing in Houston, Texas, who invested with NDD in or about November 2013.

(b)     Eamonn L. Cleary is a natural person who is a citizen of Ireland residing in Lexington, Kentucky, who invested with NDD in or about December 2012.

(c)     Clear Mountain, Ltd. was a corporation organized and that existed under the laws of New Zealand, through which Plaintiff Eamonn Cleary invested with NDD in or about December 2012.  Clear Mountain, Ltd. shares the Irish citizenship of its member, Eamonn L. Cleary.

(d)     Martin Leese is a natural person who is a citizen of the United Kingdom residing in Dubai, United Arab Emirates, who invested with NDD in or about November 2012.

(e)     Andrew Chittenden is a natural person who is a citizen of the United Kingdom residing in the United Kingdom, who invested with NDD in or about August 2013.

(f)     White Rose Properties, LLC was a limited liability company organized and that existed under the laws of Michigan, through which Plaintiff Andrew Chittenden invested with NDD in or about December 2012.  White Rose Properties, LLC shares the British citizenship of its member, Andrew Chittenden.

(g)     Stephen Royall is a natural person who is a citizen of Australia, residing in Australia, who invested with NDD in or about January 2013.

(h)     Stephen Royall and Maria Thomson S.M.S.F, LLC was a limited liability company organized in Australia and North Dakota, and therefore at all relevant times existed under the laws of both Australia and North Dakota, through which Plaintiff Stephen Royall invested with NDD in or about January 2013.  Stephen Royall and Maria Thomson S.M.S.F, LLC shares the Australian citizenship of its member, Stephen Royall.

(i)     Peter McRae is a natural person who is a citizen of Australia, residing in Australia, who invested with NDD in or about November 2013.

(j)     McRae Family Holdings, Inc. is a corporation organized and that existed under the laws of Missouri, through which Plaintiff Peter McRae invested with NDD in or about November 2013.  McRae Family Holdings, Inc. shares the Austrialian citizenship of of its shareholder, Peter McRae.

20.     Defendant Pearce & Durick (hereinafter sometimes referred to as "Defendant") is a general partnership and a law firm with its principal place of business located at 314 East Thayer Ave., Bismarck, ND.  On its website Pearce & Durick states that it "has been providing clients with quality legal service for more than 90 years and is one of North Dakota's most respected law firms."  At relevant times Pearce and Durick acted through its employees and agents, including its former partner Jonathan P. Sanstead ("Sanstead"). Upon information and belief, the owners of Pearce & Durick are Larry L. Boschee, Patrick W. Durick, and Zachary E. Pelham. Sanstead is believed to be a former owner of Pearce & Durick.

## IV.  CLASS ALLEGATIONS

21.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").  The Class in this action consists of all persons who purchased modular housing units from NDD and/or its affiliates during the Class Period and were damaged thereby ("Class").

22.     Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be obtained through appropriate discovery, Plaintiffs believe that the number of Class Members exceeds 900.   Accordingly, joinder is impracticable pursuant to FRCP Rule 23(a)(1).  Members of the Class may be identified from records maintained by Defendant, NDD and/or the Receiver, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

8

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  The questions of law and fact common to the Class include (but are not limited to):

(a)     Whether Defendant's conduct violated the North Dakota Securities Act, Chapter 10-04, N.D.C.C.;

(b)     Whether Defendant was an agent of NDD with the meaning of § 10-04-02(1), N.D.C.C.,

(c)     Whether Defendant breached a fiduciary duty to Plaintiffs and the Class;

(d)     Whether Defendant acted negligently and/or breached a duty of ordinary care owed to Plaintiffs and the Class;

(e)     Whether Plaintiffs and the Class were damaged by Defendant's unlawful conduct; and,

(f)      The measure of any damages;

24.     Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

25.     Plaintiffs have retained competent counsel experienced with class actions and complex litigation who intend to vigorously prosecute this action.

26.     Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.

27.     Class members' identities and their investments with NDD can generally be identified by records held by Defendant, NDD and/or the Receiver.

9

28.     Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## V. FACTS

### A.     The NDD Unregistered Securities Offering

29.     NDD sold investments in four projects: Great American Lodge - Watford City West, Great American Lodge - Culbertson, Montana, Transhudson - Parshall, and Great American Lodge - Watford City East.  NDD offered the investments to investors in the United States, the United Kingdom, France, Spain, Australia, Singapore, and other countries, both directly and through intermediaries.

30.     Despite the fact that each of the projects was located at a separate site and was marketed via distinct marketing materials, investments in NDD's four projects were structured similarly.  In each instance, investors bought "units" in NDD's projects for prices ranging from approximately $50,000 to $90,000 per unit.  Each unit represented a fractional interest in a modular housing unit at one of the four sites developed by NDD, and was coupled with a management agreement under which NDD would manage the unit.

31.     Under the management agreements, NDD was to manage the units as an integrated "man camp".  In soliciting investors, NDD recommended that investors select NDD to manage their units, and in fact demanded lease fees of $24,000 per year for any unit that NDD did not manage.  The $24,000 lease fee was too high to be economical, and in fact every NDD investor is believed to have agreed to have NDD manage the units purchased.

10

32.     Under the management agreement, NDD agreed to pay either a fixed return to investors of up to 25 percent per year (which NDD referred to as "guaranteed" or "assured") or a variable rate of return based on half of the gross rents collected by NDD.

33.     Approximately 900-1,000 investors ultimately purchased units in one of the four NDD developments.

34.     Despite the glossy brochures and enormous projected returns that NDD promoted, none of the NDD projects ever operated at a profit.  Indeed, of the four projects, only Great American Lodge - Watford City West ("Watford West") ever even became operational. Watford West has a completed amenities building, with services such as food services and laundry, and over 430 individual housing units that, prior to May 2015, were being rented or available to be rented. There were also approximately 70 units that were still under construction and not occupied.

35.     Watford West ceased operations when electric service to the site was shut off on or about May 7, 2015 for non-payment of bills.  In addition, because of an issue with the water lines at the site, water was being trucked onto the site every few days at a considerable cost.  The Receiver has preliminarily concluded that it is not economically feasible to reopen Watford West.

36.     Great American Lodge - Culbertson, Montana ("Culbertson") was not operational. There are approximately 132 individual housing units on the Culbertson site, but no amenities building.   Although construction of these housing units was not complete, NDD attempted to obtain a certificate of occupancy for 44 of the units in the spring of 2015, but failed the required inspection.

37.     The Transhudson - Parshall, ND ("Parshall") site is in the ground-leveling phase only.  There are no buildings on the site other than two construction trailers.  The site has been inactive for an extended period of time.

38.     The Great American Lodge - Watford City East ("Watford East") site was also never actually developed.  Governmental officials never approved the Watford East project and no construction activities have occurred on the proposed site.

**B.     Pearce & Durick's Ongoing Active Assistance and Participation In The NDD Offering**

39.     Pearce & Durick assumed a significant role in actively assisting NDD's offering unregistered securities to the public throughout the NDD offering.

40.     Investors were most commonly initially attracted by Internet advertising, including via a website known as Property Horizons (which was controlled by NDD principals Robert L. Gavin and Daniel J. Hogan).  NDD then sent or caused to be sent marketing brochures to investors, advising them that they did not need to retain separate and independent United States counsel to purchase an NDD unit because "Pearce & Durick have been appointed as the developer's attorney, they review all legal documentation relating to this investment."

41.     Investors who were interested in proceeding with the purchase of an NDD unit were then in many instances instructed to remit funds by wire to Pearce & Durick's attorney trust account at U.S. Bank.  The studio purchase and sale agreements for the units contained wiring instructions for Pearce & Durick's trust account, as well as Sanstead's contact information.

42.     NDD also instructed investors who received "Closing Packs" to finalize the purchase of units to "print the attached 'Closing Pack' and action the above, scan and email to Jonathan Sanstead, Attorney at Law, Pearce & Durick."  On information and belief, Sanstead and

persons under his supervision collected and compiled contracts and other transactional documents for sales of units as NDD's agent. These professional services or activities were performed by Sanstead and Pearce & Durick using their specialized education, knowledge, skill, labor, experience and/or training in real estate transactions.

43.     In some instances, Pearce & Durick also provided an "Opinion of Legal Counsel" to investors on its letterhead attesting to payment of all funds for purchase of a unit by the investors, as well as NDD's provision of a Bill of Sale to the investor. The "Opinion of Legal Counsel" rendered by Pearce & Durick were an activity and professional service using their knowledge, skill, labor, experience and/or training to render a professional (legal) opinion in their capacity as attorneys regarding the NDD Offering. It was also a professional service Pearce & Durick performed in connection with the research and certification of title to real estate.

44.     Pearce & Durick then held investor funds in an escrow account and was obligated to disburse same only upon completion of certain milestones in connection with each "unit." Although Pearce & Durick was under a contractual obligation to NDD investors to disburse funds from escrow to NDD only after certain milestones in each NDD development had been reached, in fact Pearce & Durick repeatedly disbursed funds early to NDD, without verifying that investors' modular units had actually been manufactured or installed.

45.     Pearce & Durick, per Sanstead and other personnel, also regularly communicated with investors by e-mail. This involvement of a well-established law firm in the investor communication process lent a false veneer of credibility to NDD and effectively lulled investors into concluding that NDD's projects were proceeding satisfactorily. Moreover, these

communications would have led the investors to reasonably believe that an attorney-client relationship with Pearce & Durick was formed or implied.

46.     Prior to November 2014, Pearce & Durick disbursed second and third stage funds from escrow to NDD without receiving confirmation that the milestones (completion of the modular unit at the factory, and installation of the modular unit on the site) for such disbursements had been reached.  Pearce & Durick did not have in place a procedure to confirm receipt of all investor paperwork, as well as Manufacturer's Statements of Origin ("MSOs") showing the modular units had been completed at the factory and Certificates of Completion ("CSCs") evidencing installation of the modular units at the project sites.  Pearce & Durick negligently continued to make disbursements of second and third stage escrow funds despite the fact that three of the four camps were not operational, and that the Parshall and Watford East developments were at the preliminary phases and had no modular housing units placed on the sites.

47.     In March 2015, Pearce & Durick instructed investors that it was no longer serving as escrow agent for NDD and provided investors with a form that it asked them to sign, authorizing Pearce & Durick to transfer their escrow funds to a Georgia law firm, Russell M. Stookey, P.C.  Although Pearce & Durick was by this time aware that the North Dakota Securities Department and the SEC were reviewing NDD, and had also become aware of various allegations from NDD unit purchasers, it did not advise NDD investors of these reasons for its withdrawal as escrow agent.

48.     By the time the Receiver was appointed, it was too late for the damage caused by Pearce & Durick's negligence to be undone.  Of the $62 million in investor funds received

14

through the Pearce & Durick account, the receiver has located only $175,000 in cash and liquid

assets in NDD's accounts, and only a fraction of the invested funds remained in escrow.

**C.**   **The NDD Offering Constituted An Integrated Offering Of Unregistered Securities**

49.     None of the securities sold by NDD were registered with the Securities and

Exchange Commission or any state securities regulator, including the North Dakota Securities

Department. None of the sales were made by or through a broker-dealer or agent registered in

accordance with N.D.C.C. § 10-04-10.

50.     These investment contracts and membership units offered for sale and sold

to the investors by NDD are securities as defined in N.D.C.C. § 10- 04-02(19) as well as under

federal law. *See* Exh. 1, Cease and Desist Order served on NDD by State of North Dakota

Securities Department, *see also SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946), Section 2(a)(1) of

Securities Act (15 U.S.C. 77b(a)(1) and Section 3(a)(10) of the Securities Exchange Act (15

U.S.C. 77b(a)(1)) (defining "security" and including "any… participation in any profit-sharing

agreement [or]… investment contract).

51.     The nature of these investments as an investment contract is evidenced by

investors' agreeing to shares in variable returns based on rental income.  In the Watford West

project, the only project that actually became operational, NDD pooled the rental income from

the operational units and distributed it proportionally to investors.  The agreements for the

Culbertson, Parshall and Watford East projects also provided for, essentially, pro rata profit-

sharing of the rental income from all units.

52.     NDD, with the active assistance and participation of Defendant, made these

offerings through general advertising, including an Internet website, commissioned sales agents,

print and online advertisements, e-mail solicitations, seminars, direct in-person solicitations, conference calls, videos, and flyers.  These sales efforts constituted a general solicitation of the purchase of securities under North Dakota and federal law.

53.     The Watford West, Culbertson, Watford East and Parshall securities sold by NDD were sold by NDD during overlapping time frames, were of the same type and class of unregistered securities, and were marketed and offered via similar and interrelated methods. The Watford West, Culbertson, Watford East and Parshall securities sold by NDD were all offered by the same persons, NDD and its principals Gavin and Hogan.

54.     The Watford West, Culbertson, Watford East and Parshall securities sold by NDD all involved investment contracts featuring a fractional ownership in modular housing units to be placed at "man camps" in the same geographic area, coupled with management agreements under which NDD would manage the units.

55.     The Watford West, Culbertson, Watford East and Parshall securities sold by NDD were part of a single plan of financing, were integrated, and resulted in the commingling of funds that NDD and its principals diverted for unauthorized purposes.

56.     Based on the foregoing, the Watford West, Culbertson, Watford East and Parshall securities sold by NDD represented a single, integrated offering of unregistered securities that was actively assisted by Defendant.

**D.      NDD, Gavin and Hogan's Diversion of Funds**

57.     Unbeknownst to Plaintiffs and the Class, NDD, Gavin and Hogan diverted the funds that they had invested in Watford West, Culbertson, Watford East and Parshall securities for unauthorized purposes.

58.     NDD received approximately $62 million in proceeds from investors in the NDD Offering.  Less than $100,000 remained in NDD's main operating account at U.S. Bank as of February 2015 despite the lack of progress on NDD's projects.

59.     After investor funds were disbursed by Pearce & Durick into NDD's operating account at U.S. Bank, NDD, Gavin and Hogan treated the funds like their personal piggy bank. Gavin and Hogan controlled this operating account and all other NDD bank accounts and therefore had access to and control over all of the investor funds.  .

60.     Rather than use investor funds on the man-camp projects, Gavin and Hogan used the funds for other unrelated projects for their own benefit.

61.     For example, Gavin and Hogan used $1.9 million of investor funds from its main operating account to finance an oil and gas project in the name of Augusta Exploration, LLC, of which NDD is a member.  Defendants Hogan and Gavin authorized this misuse of funds.

62.     Beginning in February, 2013, Gavin and Hogan used at least $5.5 million of investor funds from its main operating account to engage in several real estate transactions in the U.S. unrelated to any investor project, including:

a.      $1.65 million for the purchase of approximately 19 acres of land near Williston, North Dakota in the name of NDD Holdings 1 LLC;

b.      $1.395 million for the purchase of approximately 2.3 acres of land in Williston, North Dakota in the name of NDD Holdings 1 LLC;

c.      $1.19 million in connection with a lease-to-own real estate transaction in Trenton, North Dakota;

d.      $686,000 for the purchase of land for a single-family residential development

17

called Horizon Ridge in the name of NDD Holdings 2 LLC; and

       e.     $500,000 for the purchase of real estate and inventory in Central City, Nebraska

in the name of NDD Modular, LLC.

       Gavin and Hogan are the beneficial owners of these projects and authorized this

misuse of the proceeds of the NDD Offering.

       63.     Gavin and Hogan also misappropriated over $1.3 million for their direct personal

benefit.  Hogan transferred over $1 million from the NDD operating account to his personal

account in the United States and transferred $350,000 from NDD's operating account to a bank

account in Malaysia for Gavin's benefit.

       64.     In addition, Gavin and Hogan have spent at least $2.2 million of investor funds on

items characterized by NDD as administrative overhead, including over $1.97 million transferred

from NDD's U.S. operating account into bank accounts in the United Kingdom in the name of

NDD UK. These funds were used, among other things, to provide additional compensation to

Gavin and Hogan and pay commissions.

       65.     NDD did not disclose to investors that investor funds would be diverted

to fund other projects beneficially owned by Gavin and Hogan. Such information would have

been material to investors.

       66.     NDD used agents to procure investor funds for their scheme.  NDD provided

agents with marketing materials for use in soliciting investors.  NDD would pay agents a

minimum of 10 percent, and depending on the amount of money raised by the agent, up to 20

percent, of the proceeds raised by the agent as commissions.

67.    Over the course of their scheme, NDD paid over $10.3 million to agents, or approximately 16.5 percent of the total investor proceeds received. NDD did not disclose to investors in the offering materials or otherwise that it paid commissions, nor did NDD instruct agents to disclose commissions to investors.

68.    NDD also used the proceeds of the sale of Culbertson, Watford East and Parshall securities to pay purported "returns" to Watford West investors.  Upon information and belief, over $2.4 million in funds from later stage investors have been used by NDD to pay returns to investors in the Watford West project. However, this diversion of the proceeds of Culbertson, Watford East and Parshall investments to pay purported "returns" to Watford West investors was not disclosed to Plaintiffs and the Class.

**E.    Subsequent Events**

69.    As NDD's unlawful sale of unregistered securities and other unlawful conduct became known to the public in recent months, the Securities Exchange Commission brought suit against NDD and its principals, Robert L. Gavin ("Gavin") and Daniel J. Hogan ("Hogan"), as well as various relief defendants, alleging violation of the federal securities laws (including, without limitation, due to sales of unregistered securities). *See SEC v. North Dakota Developments, LLC,* et al., U.S. District Court, District of North Dakota Dkt. No. 4:15-cv-00053.

70.    On May 5, 2015, the Honorable Daniel L. Hovland for the U.S. District Court for the District of North Dakota granted the SEC's request for a temporary restraining order and asset freeze against NDD, Gavin, and Hogan.

71.    On May 5, 2015, the State of North Dakota Securities Department served a Cease and Desist Order on NDD. *See* Exh. 1.  The Cease and Desist Order alleges, *inter alia*, that the

NDD Offering constituted an unregistered, non-exempt sale of investment contracts (*i.e.,*, securities) within the meaning of N.D.C.C. § 10-04-02(19) and that NDD, Gavin and Hogan made misrepresentations and omissions of material fact in connection with the sale of securities under the NDD Offering, in violation of N.D.C.C. § 10-04-15(2).

72.　　At the SEC's request, Gary Hansen of Oppenheimer, Wolff & Donnelly, LLP has been appointed as receiver. According to the Receiver's June 26, 2015 initial report, despite diligent efforts the receiver has located only about $175,000 in cash and liquid assets owned by NDD- although NDD is believed to have received over $62 million in proceeds from the NDD Offering into its main bank account.

73.　　According to the SEC's complaint, NDD, Gavin and Hogan directly or indirectly made material misrepresentations and omissions regarding the use of investor funds, the payment of commissions, and the return on the investment. Among other things, the SEC alleges that NDD's first project was delayed and unprofitable. The SEC alleges that, despite the lack of profits, the Defendants made Ponzi-style payments to certain early investors by paying their "guaranteed" returns using funds provided by later investors.

74.　　The SEC also alleges that instead of developing the projects as promised, the Defendants have misappropriated over $25 million of investor funds to pay undisclosed commissions to sales agents, make payments to Gavin and Hogan, make investments in unrelated Bakken area projects for Gavin's and Hogan's personal benefit, and to make the Ponzi-like payments.

75.　　Plaintiffs now bring this class action seeking to recover damages from Pearce & Durick for joint and several liability under N.D.C.C. § 10-04-17(6)(a) based on, *inter alia,*

Defendant's active assistance in NDD's offering unregistered securities to the public and other violations of the North Dakota Securities Act.

## FIRST CAUSE OF ACTION

### (For Joint and Several Liability Under North Dakota Securities Act, N.D.C.C. § 10-04)

76.     Plaintiffs set forth all of their previous allegations as though repeated in full herein.

77.     NDD, Gavin and Hogan violated N.D.C.C. § 10-04-04 by selling securities in the NDD offering that were neither registered nor exempt from registration, as alleged more fully in Pars. 49-56, *supra*.

78.     NDD, Gavin and Hogan violated N.D.C.C. § 10-04-15(2) by, in connection with the offer, sale, or purchase of securities: (a) employing devices, schemes, or artifices to defraud; (b) making untrue statements of a material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated or would operate as a fraud or deception upon purchasers or the public. NDD, Gavin and Hogan did so, *inter alia*, by selling Plaintiffs and members of the Class securities in the NDD Offering without disclosing the material facts set forth in Pars 57-68, *supra*.

79.     Each of NDD, Gavin and Hogan's misrepresentations and omissions to plaintiffs was material.

80.     Plaintiffs relied or may be deemed to have relied to their detriment, on  NDD, Gavin and Hogan's false and misleading material misrepresentations and omissions

81.     As a direct and proximate cause of NDD, Gavin and Hogan's violations, plaintiffs were damaged.

82.     Defendant is jointly and severally liable for the violations of the North Dakota Securities Act by NDD, Gavin and Hogan by virtue of Pearce & Durick's actions as an agent of NDD and active assistance of NDD and participation with NDD in connection with the NDD Offering. *See* N.D.C.C. § 10-04-17 (providing that every "...agent of or for [a] seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser."). Defendants acts of active assistance include, *inter alia,* the acts set forth in Pars. 39-48, *supra*.

## SECOND CAUSE OF ACTION

### (For Breach of Fiduciary Duty)

83.     Plaintiffs set forth all of their previous allegations as though repeated in full herein.

84.     By virtue of its position as escrow agent for the NDD Offering, Defendant owed fiduciary duties to Plaintiffs and the Class under North Dakota law.  In addition, members of the Class may also have reasonably believed that they had an attorney-client relationship with Pearce & Durick by virtue of its rendering advice and/or professional services to them, thereby causing Pearce & Durick to owe a fiduciary duty to the Plaintiffs and the Class under North Dakota law.

85.     Defendant's fiduciary duties included, but were not limited to, duties of due care, loyalty, candor and good faith.

86.     By reason of the conduct alleged herein, the Defendant breached its fiduciary duties to Plaintiffs and members of the Class.

87.   As a direct and proximate result of Defendant's beached of fiduciary duty, Plaintiffs and members of the Class were damaged.

## THIRD CAUSE OF ACTION

### (For Negligence)

88.   Plaintiffs set forth all of their previous allegations as though repeated in full herein.

89.   Pearce & Durick had a duty to Plaintiffs to use the degree of care, knowledge and skill ordinarily possessed by law firm, and exercise reasonable care and competence, in connection with the professional services that it rendered in connection with the NDD Offering.

90.   Defendant breached its duties by failing to exercise due professional care in a reasonably skilled manner in accordance with applicable professional principles and standards in connection with the professional services that it rendered in connection with the NDD Offering.

91.   In particular, Defendant negligently disregarded that the NDD Offering was a non-exempt, unregistered offering of securities, and disbursed second and third stage funds from escrow to NDD without receiving confirmation that the milestones (completion of the modular unit at the factory, and installation of the modular unit on the site) for such disbursements had been reached.

92.   Pearce and Durick's negligence directly and proximately caused Plaintiffs to incur substantial damages.

## JURY DEMAND

93.   Plaintiffs demand a trial by jury.

23

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment:

(a)     Ordering that this action proceed as a class action as to all claims

previously alleged;

(b)     Awarding money damages, including prejudgment interest, on each claim

in an amount to be established at trial;

(c)     Awarding statutory attorneys' fees and costs, and other relief;

(d)     Granting such other relief as to this Court may seem just and proper.

Dated: July 20, 2015

LARSON LAW FIRM, P.C.

/s/ Mark. V. Larson
By: Mark V. Larson (ID# 03587)
P.O. Box 2004
Minot, ND 58702-2004
(701) 839-1777
larlaw@srt.com

LAW OFFICE OF
CHRISTOPHER J. GRAY, P.C.
Christopher J. Gray
360 Lexington Avenue, 14th Floor
New York, NY 10017
(212) 838-3221
chris@investorlawyers.net

LAW OFFICES OF
JOSHUA B. KONS, LLC
Joshua B. Kons
50 Albany Turnpike, Suite 4024
Canton, CT 06019
(860) 920-5181
joshuakons@konslaw.com

*Attorneys for Plaintiffs*